UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Kate Spade LLC and Coach Services, Inc.**, | Civil Action No.: 1:23-cv-05409-LGS VF |
| Plaintiffs, | |
| v. | |
| **Vinci Brands LLC, ACS Group Acquisitions LLC, Onward Brands LLC, Charles Tebele, and Sam "Sonny" Haddad,** | |
| Defendants. | |
| **ACS Group Acquisition LLC, individually and as Successor-In-Interest by Assignment to Monroe Capital Management LLC** | |
| Third-Party Plaintiff and Counterclaimant, | |
| v. | |
| **Kate Spade LLC and Coach Services, Inc.** | |
| Counterclaim Defendants, | |
| and | |
| **Case-Mate, Inc.** | |
| Third-Party Defendant. | |

## THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Kate Spade LLC and Coach Services, Inc. (collectively, "KSNY") bring this action against Vinci Brands LLC ("Vinci"), ACS Group Acquisitions LLC ("ACS")[1], Onward Brands LLC ("Onward"), Charles Tebele ("Tebele"), and Sam "Sonny" Haddad ("Haddad") for injunctive relief, declaratory relief, and damages based on trademark infringement, unfair competition and false advertising, deceptive trade practices, trademark dilution, breach of contract, tortious interference, and related claims.

---

[1]    A search has revealed a Delaware limited liability company registered to do business in New York under the name ACS Group Acquisition LLC (without an "s"). ACS's complaint in the ACS Action (defined below) refers to ACS as "ACS Group Acquisitions LLC." Assuming ACS Group Acquisition LLC is the same entity as ACS Group Acquisitions LLC in the ACS Action and/or assuming ACS Group Acquisition LLC is the proper name, this third amended complaint is directed to both entities and the term "ACS" refers to both names.

1

**<u>INTRODUCTION</u>**

1.      For nearly a decade, KSNY partnered with Vinci (and its predecessors and affiliates) as an authorized licensee for KATE SPADE® branded tech accessories, such as phone cases and accessories.  When Vinci began having trouble paying royalties under the License Agreement, in recognition and support of that partnership KSNY worked with Vinci to put several mutually-agreed upon payment plans in place and to extend payment deadlines.  Then, not only would Vinci have additional time to make the required payments, but also KSNY and Vinci could continue what was a beneficial licensor-licensee relationship.

2.      However, months and months passed, and Vinci did not follow the payment plans, did not meet the extended deadlines, and did not pay KSNY the royalties and other amounts due. KSNY was left with no choice but to issue a Notice of Default given that Vinci owed several millions of dollars in royalties and KSNY needed to protect its immensely valuable brand and goodwill.

3.      Seventy-five days then passed with insubstantial progress from Vinci regarding the default and rectifying the owed royalties.  KSNY then, appropriately, and pursuant to the License Agreement, terminated the license on June 14, 2023.

4.      Discovery also has revealed that, prior to that June 14, 2023 termination, Vinci concealed from KSNY that the License Agreement had automatically terminated for several reasons, including because: (i) Vinci's was unable to pay its debts generally as they become due; (ii) on February 10, 2023, Vinci defaulted on more than $1 million of debt secured by Kate Spade's licensed merchandise; (iii) on March 3, 2023, Vinci discontinued a substantial portion of its business by transferring key duties and functions under the License Agreement to a third party; and (iv) on June 5, 2023, through a series of transaction between Vinci and Onward, Tebele, and Haddad, Vinci underwent a change of control, took corporation action in furtherance of ceasing its operations, and discontinued all or a substantial portion of its business operations.

5.      Since the License Agreement's termination, Vinci, Onward, Tebele, and Haddad have:

- Improperly and without authorization used the KATE SPADE® Marks (defined herein) as if they were authorized licensees, willfully dealing in infringing and counterfeit goods;

- Actively worked to undermine, sabotage and otherwise disrupt Kate Spade's efforts to work with its new licensee, Case-Mate, Inc. ("Case-Mate"), including when KSNY and Case-Mate were in a critical window to manufacture, accept orders and sell items related Apple's expected September 2023 launch;

- Intentionally interfered with manufacturers, customers and distributors, including by telling them that Vinci (not Case-Mate) is somehow KSNY's only authorized licensee; and,

- Further, without any notice to KSNY, on June 16, 2023, Vinci filed a lawsuit against KSNY and, again without any notice, on June 23, moved the Court to order KSNY to act as if the license somehow did not terminate on June 14.

6. Vinci apparently erroneously believes that the termination was not effective because there was a ministerial, typographical error in the Notice of Termination. And, Vinci erroneously claims that "force majeure" prevents termination, notwithstanding agreed-to contractual terms to the contrary.

7. Vinci's actions are hindsight justification for KSNY's termination of the license, and KSNY brings this lawsuit to end Vinci's, ACS's, Tebele's, and Haddad's harassment and interference and to recover what is rightfully owed.

8. Vinci, Onward, Tebele, and Haddad have inflicted immeasurable damage to KSNY nor to the goodwill and reputation associated with the famous KATE SPADE® Marks.

9. Further, ACS, led by Tebele and Haddad, without notice and for the first time on June 17, 2023, revealed itself as an alleged secured creditor of Vinci, asserting alleged security interests in the KATE SPADE® branded tech accessories in inventory manufactured by Vinci and

in-process, non-cancelable orders of Vinci (collectively, the "Alleged Collateral"). ACS seeks solely to maximize its profit on a loan to Vinci that ACS purchased for less than 2 cents on the dollar, without regard to Kate Spade's ongoing business or goodwill.

10. On July 1, 2023, ACS asserted it had the right to seize, take possession of, dispose of, and sell the Alleged Collateral, all of which actions are prohibited under both the plain terms of the License Agreement, which provide various, agreed-to limitations to Vinci's rights (and therefore ACS's alleged rights), as well as the Lanham Act's protections over KSNY's right to control use of its KATE SPADE® Marks. ACS took affirmative steps to pursue these prohibited actions against the Alleged Collateral, including filing a complaint in New York State Supreme Court and moving for a preliminary injunction and temporary restraining order against KSNY, to order (among other things) "Defendants to issue a Letter of Authorization" – in the form of a letter on Kate Spade letterhead attached to ACS's affidavit that ACS proposes to rewrite without KSNY's permission – "to be distributed to Vinci's suppliers and customers … stating that ACS (and any appointed agent) is authorized by Defendants to manufacture, distribute, and/or the sell" the Alleged Collateral.

11. ACS's repeated threats and actions to seize, take possession of, dispose of, and sell tech accessories bearing the KATE SPADE® Marks, along with the affirmative step of filing the New York action and publicly stating that ACS is authorized to manufacture, distribute, and/or sell such products – all without Kate Spade's authorization and in flagrant disregard of its rights and responsibility to exercise control over products featuring the famous KATE SPADE Marks ® and brand – constitute infringement. In addition, ACS's threats and actions establish that its infringement is imminent and impending, giving rise to a justiciable controversy between the parties, such that KSNY seeks a declaration that (i) ACS's alleged rights (if any) to the KATE SPADE® branded tech accessories are subject to all restrictions and limitations imposed under the License Agreement, including all post-termination restrictions and applicable law, (ii) accordingly, ACS has no right to seize, take possession of, dispose of, and/or sell the Alleged Collateral, and (iii) any use, distribution, disposition, or sale of the KATE SPADE® branded tech accessories by

4

ACS would violate the License Agreement and constitute trademark infringement under the Lanham Act.

12.    Based on these actions, KSNY is entitled to damages from Vinci, ACS, Onward, Tebele, and Haddad and injunctive relief enjoining Vinci, ACS, Onward, Tebele, and Haddad from (among other things) acts of infringement, as set forth below.

## **PARTIES**

13.    Kate Spade LLC is a Delaware limited liability company duly organized and existing under the laws of the State of Delaware with a place of business at 2 Park Avenue, New York, New York 10016, and is an indirectly wholly-owned subsidiary of Tapestry, Inc. ("Tapestry").

14.    Coach Services, Inc. is a Delaware limited liability company duly organized and existing under the laws of the State of Delaware with a place of business at 10 Hudson Yards, New York, New York 10001, and is a wholly-owned subsidiary of Tapestry.

15.    Vinci is a limited liability company organized under the laws of the State of Delaware, and has two managers, Steve Latkovic, an individual domiciled in Ohio, and Glenn Pollack, an individual domiciled in Florida.

16.    As ACS has alleged in its complaint in the ACS Action (defined below), ACS is a Delaware limited liability company with a principal place of business in New York, New York.

17.    Onward is a Delaware limited liability company with a principal place of business in New York, New York.

18.    Tebele is an individual who lives in New York, New York. Though an LLC, Tebele owns two-thirds of ACS and Onward. He also is managing member of ACS and the CEO of Onward.

19.    Haddad is an individual who lives in Brooklyn, New York. Though an LLC, Haddad owns one-third of ACS and Onward. Haddad also is a member of ACS and is a manager of Onward.

## JURISDICTION AND VENUE

20.     Under 28 U.S.C. §§ 1131 and 1138(a), this Court has original subject matter jurisdiction over Kate Spade's First, Ninth, and Twelfth Causes of Action for federal trademark infringement under 15 U.S.C. § 1114, Second, Tenth, and Thirteenth Causes of Action for federal unfair competition and false advertising under 15 U.S.C. § 1125(a), and Eleventh Cause of Action for a declaratory judgment.

21.     Under 28 U.S.C. §§ 1338(b) and 1367(a), this Court has supplemental jurisdiction over Kate Spade's Third Cause of Action for New York trademark infringement, Fourth Cause of Action for New York deceptive trade practices, Fifth and Fourteenth Causes of Action for New York trademark dilution, Sixth and Fifteenth Causes of Action for common law unfair competition, Seventh Cause of Action for breach of contract, Eighth Cause of Action for tortious interference with a business relationship, Eleventh Cause of Action for declaratory judgment, and Sixteenth Cause of Action for tortious interference with contract, because those claims form part of the same case and controversy as Kate Spade's federal claims, and arise from a common nucleus of operative facts.

22.     This Court has personal jurisdiction over Vinci because as a party to the License Agreement, Vinci has submitted itself to the personal jurisdiction of this Court, pursuant to Section 21.3 of that agreement.

23.     This Court further has personal jurisdiction over Vinci because it regularly transacts business in New York.

24.     This Court has personal jurisdiction over ACS because, among other reasons, (i) ACS commenced the ACS Action (defined below) against KSNY, concerning the same subject matter as this action, in New York Supreme Court, and (ii) as ACS has alleged in its complaint in the ACS Action, ACS has a principal place of business in New York, New York and transacts business with, at least, Vinci in New York.

25.    The Court has personal jurisdiction over Onward because it is headquartered in New York, New York at 767 Fifth Ave, 37th Floor and because it regularly transacts business in the State of New York.

26.    The Court has personal jurisdiction over Tebele because he is a resident of New York, New York, and because he regularly transacts business in the State of New York.

27.    The Court has personal jurisdiction over Haddad because he is a resident of Brooklyn, New York and because he regularly transacts business in the State of New York.

28.    Venue is proper in this judicial district under 28 U.S.C. 1391(b) and (c) because, on information and belief, a substantial part of the events giving rise to the claims occurred in this district.

## FACTS

### A.    THE KATE SPADE NEW YORK BRAND.

29.    For nearly 25 years, Kate Spade, through its predecessors-in-interest and licensees, has been an iconic global fashion and lifestyle brand.

30.    Since its debut in 1993 with a few handbags, the kate spade new york brand (collectively with KSNY, "Kate Spade") established itself quickly as an iconic American brand. In the following three decades, Kate Spade has evolved into a global lifestyle brand offering more than 20 product categories in the United States and around the world. Kate Spade is a worldwide leader in the design, manufacture, marketing, and distribution of premium lifestyle products, including, but not limited to as relevant here, a full line of tech accessories, in addition to apparel, bags, footwear, eyewear, jewelry, watches, consumer home goods, cosmetics, and fragrances (collectively, the "Kate Spade Goods").

31.    Kate Spade first registered the KATE SPADE® mark in 1997. Kate Spade now owns more than 65 registrations for its KATE SPADE® Marks at the U.S. Patent and Trademark Office, alone, that are used by Kate Spade, and its authorized licensees, and that consist of or include the word mark, KATE SPADE® (the "KATE SPADE® Word Marks"), and/or the logo/design mark, ♠ ®, including for example KATE SPADE and the logo/design mark shown below:



(collectively the "KATE SPADE® Marks").

32.    Kate Spade's marketing efforts and sales success, combined with its close attention to the quality, design, and construction of its products, has resulted in the KATE SPADE® Marks becoming universally recognized and associated with a distinctive look, elegance, and quality that points exclusively and unmistakably to Kate Spade. By virtue of the extensive distribution and success of Kate Spade's Goods and related services, the KATE SPADE® Marks are distinctive and famous.

33.    In part, Kate Spade accomplishes its distribution of Kate Spade Goods and related services through granting trademark licenses to third-party entities that contract directly with product manufacturing facilities and factories, as well as customers, both distributors and retailers, to produce, distribute, and sell Kate Spade Goods.

34.    Today, Kate Spade offers at least 15 product categories in the United States and around the world, including: (i) tech accessories (including phone covers, audio, earbuds and headphones, charging devices and small speakers for home); (ii) handbags; (iii) small leather goods; (iv) and ready-to-wear apparel (including dresses, separates, jackets, outerwear, skirts and pants) (v) wearable tech (smart watches); (vi) jewelry; (vii) watches; (viii) footwear; (ix) sleepwear; (x) swimwear; (xi) legwear; (xii) loungewear; (xiii) outerwear; (xiv) kids apparel and

accessories; (xv) hair accessories; (xvi) fragrances; (xvii) home décor (including lighting, bedding and bath, and stationery); and (xiii) tabletop (including fine china, barware, place settings, casual dining and kitchen items).

35. Kate Spade has succeeded in extending its brand into different product categories and consumer markets primarily through a number of licensing partnerships, including cobranding and/or product collaborations. Over the last several years, Vinci (and its predecessor Incipio) has been the non-exclusive license partner for tech accessories, including phone cases.

36. Kate Spade has received worldwide recognition and numerous accolades for its innovation and reach in product design and its successful marketing strategies. Specifically with regard to product design, Kate Spade has been repeatedly recognized in connection with the design of its tech accessories, watches, fragrance, and eyewear, among other product lines.

37. Kate Spade has dedicated millions of dollars to market its Kate Spade Goods, which includes the distribution of brand imagery in film and print, digital and social media, outdoor advertising, and at public relations efforts, fashion events and presentations.

38. Kate Spade also invests in digital advertisements aimed at potential customers browsing third-party websites and maintains and operates Kate Spade pages on all major social media platforms, including, Facebook, Instagram, TikTok, Pinterest, Twitter, and YouTube. Kate Spade has amassed 3.3 million followers on Instagram and over 4 million followers on Facebook. Additionally, Kate Spade enjoys 76 million views of its YouTube content and 10 million views per month of its Pinterest content.

39. Kate Spade's business includes direct-to-consumer sales, through its own retail stores and its online store. Over the years, the number of visits to Kate Spade's online store has grown into the millions.

40. Kate Spade's sales of products bearing the KATE SPADE® Marks have grown to billions of dollars. Sales of Kate Spade tech accessories—the products at issue here—are equally significant selling tens of millions annually.

41.    Kate Spade also sells its products at approximately 200 retail and outlet stores across the U.S. Kate Spade sells wholesale to specialty stores and major department stores and Kate Spade's third-party retailers sell Kate Spade-branded merchandise in their retail locations and through their websites. Kate Spade also sells its goods through online retailers.

**B.    THE KATE SPADE® MARKS.**

42.    Kate Spade owns more than 65 registrations for its KATE SPADE® Marks at the U.S. Patent and Trademark Office alone, including those depicted in the chart previously submitted as <u>Plaintiffs'</u> <u>Exhibit</u> ("PX") <u>1</u>[2] (ECF No. 1-1).

43.    Many of Kate Spade's federal registrations of the KATE SPADE® Marks are incontestable within the meaning of the Section 15 of the Lanham Act, 15 U.S.C. § 1065, including at least those so indicated in the chart attached hereto as <u>PX1</u> (ECF No. 1-1).

44.    Kate Spade's registrations for its KATE SPADE® Marks at the U.S. Patent and Trademark Office include, for example:

- Incontestable U.S. Trademark Registration No. 4138884 for KATE SPADE NEW YORK® in connection with "Carrying cases for electronic equipment, namely, cell phones and laptops; Cell phone covers; Protective sleeves for laptop computers";

- U.S. Trademark Registration No. 5205421 for ♠® in connection with "Carrying cases specially adapted for electronic equipment, namely, cell phones, laptops, electronic book readers, portable PC tablets, ear buds and portable media players; computer mouse; ear buds; eyeglass chains and cords; eyewear; eyewear cases; protective covers and cases for cell phones, laptops and portable media players; protective covers and cases for tablet computers; USB (universal serial bus) hardware"; and

---

[2]    Exhibits PX1-PX28 are part of and were used in connection with the Verified Complaint (ECF No. 1), the then-concurrently filed Declaration of Charlotte Warshaw in Support of Application for a Temporary Restraining Order and Preliminary Injunction (ECF No. 8), and the Amended Verified Complaint (ECF No. 25) in this action. All such exhibits, PX1-PX28, are incorporated by reference as if fully set forth herein. The same numbering convention for the same exhibits also used in the prior pleadings is continued here for consistency.

- U.S. Trademark Registration No. 6505371 for ❖® in connection with "Carrying cases for electronic equipment, namely, for cell phones and digital book readers; computer mouse; ear buds; mouse pads; protective covers and cases for cell phones, laptops and portable media players; laptop carrying cases; protective covers for electronic reading devices; USB (universal serial bus) hardware; smartwatches; wearable activity trackers; wireless indoor and outdoor speakers; headphones; chargers for batteries; measuring cups; eyeglass chains and cords; eyeglass frames; eyeglasses; eyewear; eyewear cases; sunglasses."

45.    The KATE SPADE® Marks have been prominently and continuously used in Kate Spade's sales and marketing of virtually all product categories, since the debut of its iconic handbags, including on product packaging and hangtags, throughout the <katespade.com> website and associated social media accounts, and in connection with the products themselves, including on various tech accessories.

46.    Kate Spade's widespread and continuous use of the KATE SPADE® Marks since 1997 has made the KATE SPADE® Marks both synonymous with the brand and famous, in addition to conferring valuable common law rights upon Kate Spade.

47.    The Trademark Trial and Appeal Board (the "Board") has twice held that the KATE SPADE® Marks are "very strong." *Kate Spade LLC v. Thatch, LLC and The Spades Trademark Company, LLC*, No. 91216585, 2020 WL 242513, at *9 (Jan. 9, 2020) (the KATE SPADE® mark is "conceptually strong and commercially very strong"); *see also Kate Spade LLC v. WOLV, Inc.*, No. 91241442, 2022 WL 1237459, at *16 (Apr. 25, 2022) (the "KATE SPADE mark and spade logo are very strong marks," and "the KATE SPADE mark and the spade design are both inherently strong and commercially strong").

## C.    THE TERMINATED LICENSE AGREEMENT.

48.    On or about April 25, 2014, Kate Spade and Incipio Technologies, Inc. ("Incipio") entered into a License Agreement granting Incipio a "***non-exclusive*** license solely to use the

Licensed Mark(s) in the Territory as a trademark(s) in connection with the manufacture, advertising, merchandising, promotion, sale and distribution of Approved Licensed Merchandise to Approved Customers." (*See* PX2, ECF No. 1-2, License Agreement dated April 25, 2014, § 2.1(a)) (emphasis added).

49. The License Agreement remained in effect, and was amended a number of times, over the following eight years, including:

a. On or about January 13, 2016, in conjunction with Incipio's assignment of the License Agreement to Incipio, LLC, (*see* Consent Assignment, attached as Exhibit 10 to the Warshaw Decl.) (ECF Nos. 8-9, 10-9 in this action.)

b. On or about November 13, 2019, in conjunction with Coach Services claiming exclusive right to use, exploit, and sublicense all trademark rights owned by Kate Spade, including the KATE SPADE® Marks (*see* Fourth Amendment to the License Agreement); and

c. On or about January 1, 2022, in conjunction with Incipio, LLC's assignment of the License Agreement to Vinci (*see* PX3, ECF No. 1-3, Sixth Amendment to the License Agreement).

50. In exchange for the right to use certain of the KATE SPADE® Marks, Incipio, and its successors in interest, Incipio LLC and Vinci, agreed to pay certain Guaranteed Minimum Royalties, Image Fund Payments, and Creative/Design Fees (as those terms are defined in the License Agreement, collectively, the "Required Fees"). (*See* PX2, ECF No. 1-2, §§ 7 and 8.)

## D. VINCI'S DEFAULTS ON AND BREACHES OF THE TERMINATED LICENSE AGREEMENT.

51. In September 2022, the parties agreed on a modified timeline for Vinci's payment of Required Fees for fiscal year 2023. On December 1, 2022, Kate Spade and Vinci agreed to modify the payment plan further to allow for monthly, rather than annual payment of the Required Fees.

52.     On a December 13, 2022 videoconference, Vinci admitted that it would not make the November 2022 or December 2022 payments of the Required Fees on time, prompting Vinci and Kate Spade to agree on an additional modified payment plan, entered into on February 14, 2023.

53.     Pursuant to the February 14, 2023 modified plan, Vinci agreed to pay $50,000.00 in installment payments towards the amount of Required Fees owed on both of January 31 and February 28, 2023, and the balance of the amount owed, $3,497,686.00, on March 24, 2023. Vinci paid the January and February installment payments by their respective due dates.

54.     On a March 7, 2023 videoconference, Vinci admitted that it would not pay the balance of the amount due by the March 24, 2023 due date. Instead, on March 13, 2023, Vinci proposed to pay a $100,000.00 installment payment by March 24, 2023, and the balance in mid-April 2023.

55.     On March 20, 2023, Kate Spade sent Vinci a Notice of Non-Payment, documenting Vinci's failure to pay amounts due and demanding payment of all amounts due (which at the time was approximately $3.7 million) within three (3) business days, March 23, 2023, as provided for in Section 3.3(a) of the License Agreement.

56.     On March 22, 2023, Vinci responded by letter to the Notice of Non-Payment, cited supply issues as to the iPhone 14 and *for the first time* purported to "exercise" rights under the force majeure clause of the License Agreement.

57.     Vinci did not cure its non-payment by the March 23, 2023 deadline,[3] and, on March 31, 2023, Kate Spade sent Vinci a Notice of Default and explained that invocation of the force majeure clause was unavailing. Paragraph 21.11 of the Sixth Amendment to the License Agreement, entitled "**Force Majeure**" plainly states: "The occurrence of a Force Majeure Event … does not affect [Vinci's] obligation to timely make any required payment or provide any required statements or reports." (PX3, ECF No. 1-3, Sixth Amendment, ¶ 21.11.)

---

[3]     Vinci later, on March 29, 2023, made a deficient, $100,000.00, payment to Kate Spade and, on May 5, 2023, a further deficient payment of $400,000.00.

58. That same Paragraph 21.11 of the Sixth Amendment to the License Agreement, entitled "**Force Majeure**" also provides: "Upon occurrence of a Force Majeure Event, the nonperforming Party shall promptly notify the other Party of a Force Majeure Event's effect on performance, and how long it is expected to last." (*Id.*)

59. In the Notice of Default, Kate Spade also invited Vinci to engage in further discussion of repayment of the Required Fees owed.

60. On June 14, 2023, after receiving no further response from Vinci for 75 days, Kate Spade sent Vinci a Notice of Termination, pursuant to Section 3.5 of the License Agreement. Section 3.5 provides, "If the event of default occurs and is continuing, the non-defaulting party may, by written notice to the defaulting party, immediately terminate this Agreement . . . ." (PX2, ECF No. 1-2, License Agreement, §3.5.)

61. In addition to the basis of termination set forth in the Notice of Termination, the License Agreement also terminated automatically before the Notice of Termination for several reasons, which Vinci concealed from Kate Spade.

62. First, for much of 2022 and throughout 2023, Vinci was unable to pay its debts generally as they became due. As a result, the License Agreement terminated automatically under Sections 3.3(b) and 3.5.

63. Second, on February 10, 2023, Vinci's lender, Siena Lending Group LLC ("Siena"), declared an event of default of its loan agreement with Vinci on obligations exceeding $1 million which were secured by interests in Kate Spade Goods. After declaring an event of default, Siena exercised several default remedies under its Loan Agreement with Vinci, including sweeping Vinci's bank accounts, commencing a sale of Vinci's assets under Article 9 of the Uniform Commercial Code, and requiring Vinci to engage a financial consultant. Vinci did not notify Kate Spade of its default to Siena or Siena's exercise of remedies in breach of Section 3.6(a) of the License Agreement, and Kate Spade did not agree to waive the default. As a result of Vinci's default to Siena, the License Agreement terminated automatically under Sections 3.3(d) and 3.5.

As a result of Vinci's default to Siena, Vinci also lost the right to sell Licensed Merchandise under Section 3.6(a).

64.    Third, on March 3, 2023, Vinci entered a Manufacturing and Distribution Agreement (the "MDA") with Superior Communications, Inc. ("Superior"), pursuant to which Vinci transitioned a significant portion of its duties under the License Agreement to Superior, including product manufacturer oversight, inventory management, customer management, forecasting, shipping, logistics, and billing. Vinci obtained Kate Spade's approval for Superior to be a distributor for Vinci in the United States, but concealed from Kate Spade the true extent of the functions and duties being transferred to Superior and did not seek or obtain Kate Spade's approval for Superior to assume other responsibilities from Vinci under the License Agreement, in breach of Section 2.3(a) of the License Agreement. Vinci did not disclose the MDA to Kate Spade at any time. By entering and implementing the MDA, Vinci discontinued a substantial portion of its business operations, which resulted in automatic termination of the License Agreement under Sections 3.3(b), 3.3(e), and 3.5.

65.    Fourth, on June 5, 2023, Vinci, Tebele, Haddad, and their companies ACS and Onward devised and entered into a web of connected transactions, through which Vinci transferred substantially all of its assets and ceased its business operations. Vinci remained KSNY's licensee in name only, and the series of transactions resulted in a change in control and assignment prohibited by Section 2.3(a) of the License Agreement. More specifically:

a.    On June 5, 2023, Tebele and Haddad's company ACS purchased a loan facility from Monroe Capital Management Advisors, LLC ("Monroe"), under which Monroe had lent approximately $174 million to Vinci. On the same day that ACS acquired the Monroe loan, ACS exercised default remedies as Vinci's lender, including by having Haddad use a power of attorney on behalf of Vinci.

b.    On June 5, 2023, Tebele and Haddad's company Onward purchased most of Vinci's assets pursuant to an Asset Purchase Agreement, leaving just

15

Vinci's License Agreements with Kate Spade and Coach[4] and a few other assets in Vinci. Shortly thereafter, all of Vinci's employees transferred from Vinci to Onward.

c.  On June 5, 2023, Vinci delegated its remaining business functions to Onward pursuant to a Sales Agency and Services Agreement (the "Services Agreement"). The Services Agreement was signed by Haddad on behalf of Vinci, as Vinci's attorney in fact, and Tebele on behalf of Onward. Through the Services Agreement, Vinci appointed Onward as its "exclusive service provider" and "exclusive sales agent," and transferred authority to Onward for sales, sourcing and logistics, warehousing and distribution, customer invoicing and collection, information technology, and back office and accounting for the unsold portion of Vinci's business.

d.  Through the June 5, 2023 transactions, Vinci took corporate action in furtherance of ceasing doing business as a going concern and discontinued a substantial portion of its business operations, which resulted in automatic termination of the License Agreement under Sections 3.3(b), 3.3(e), and 3.5.

e.  The June 5, 2023 transactions resulted in a change in control of Vinci, because they resulted in Tebele and Haddad taking control of Vinci through powers of attorney, ACS (which controlled Vinci's finances and inventory), and Onward (which controlled Vinci's operations). This resulted in automatic termination under Sections 3.3(f) and 3.5 of the License Agreement.

66.  As a result of the termination of the License Agreement, all of Vinci's rights to use the KATE SPADE® Marks terminated and reverted to Licensor, and, except for limited

---

[4] The Coach® Brand is also owned by Tapestry. Vinci was also the Coach® Brand licensee for tech accessories, such as phone cases and accessories pursuant to a separate license agreement. That agreement expired on June 30, 2023.

circumstances,[5] Vinci and all of its associated entities and individuals were required to cease and permanently discontinue any use of the KATE SPADE® Marks in connection with manufacturing, advertising, promoting, offering to sell, selling, distributing, or dealing in or with licensed merchandise, *i.e.*, tech accessories.  (*See* PX2, ECF 1-2, § 12.1(a).)

67.    Specifically, Section 12.1(a) provides (subject only to inapplicable exceptions) that upon termination of the License Agreement "all rights of Licensee hereunder will terminate and revert automatically to Licensor, and neither Licensee nor any of its receivers, representatives, trustees, agents, successors or assigns (by operation of law or otherwise) will have any right to manufacture, exploit, advertise, merchandise, promote, sell, distribute or deal in or with Licensed Merchandise, and Licensee and all of its assignees, successors or assigns (by operation of law or otherwise) will forthwith discontinue all use of the Licensed Mark(s) and any derivation, component, variation or simulation thereof, or any mark confusingly similar therewith, and all references thereto or hereto …."

68.    Further, Section 12.1(a) provides that upon termination of the License Agreement " . . . all Merchandise Concepts, Design Concepts, Packaging, Merchandise, sketches, designs, colorways, Samples, and labels provided or employed exclusively hereunder, including any modifications or improvements thereof, and any patents, trademarks, copyrights, trade names and other proprietary rights in connection therewith, all of which will revert to Licensor [KSNY] without any action by any Person and without payment or consideration of any kind to Licensee [Vinci], and Licensee [Vinci] hereby irrevocably releases and disclaims any right or interest in or to any and all of the foregoing."  (*See* PX2, ECF 1-2, 12.1(a).)

69.    Section 12.1(c) provides that the foregoing provisions "shall take precedence over any conflicting provision of this Agreement."

---

5    Under the terminated License Agreement, Vinci has a limited right to complete the production of products that, as of the termination date, is in process or for which non-cancelable written orders have been received.  (*See* PX2, ECF No. 1-2, §§ 12.3, 12.1(b).)  However, any such products are subject to Kate Spade's "Inventory Purchase Option." (*See id.* § 12.3.)  That notwithstanding, because Vinci was in default under the License Agreement as of March 23, 2023, since then they had *no right* to sell any inventory to customers.  (*See id.*, §§ 12.1-12.4.)

70.     Regardless of the foregoing consequences of the License Agreement's termination on June 14, 2023, Sections 3.6(a) and 3.3(d) of the License Agreement provide that if Vinci defaults on any obligation in excess of $1 million "secured by a security interest in any Licensed Merchandise, automatically and simultaneously therewith Licensee no longer shall have the right to sell or otherwise transfer Licensed Merchandise or otherwise use the Licensed Mark(s) until" Kate Spade is notified and notifies in writing that it elects to waive its right to immediate termination under Section 3.3(d). (PX2, ECF 1-2, §§3.3, 3.6.)

71.     Accordingly, regardless of the effect of the June 14, 2023 Notice of Termination, as a result of Vinci's defaults on obligations to KSNY and/or ACS or any predecessor-in-interest, Vinci had no right to sell or transfer any "Licensed Merchandise" at least as early as February 10, 2023 when Vinci received a default notice from Siena and failed to notify KSNY.

**E.     VINCI'S AND ONWARD'S INTERFERENCE WITH KATE SPADE'S LICENSE WITH CASE-MATE IN ADVANCE OF APPLE'S EXPECTED LAUNCH OF ONE OR MORE NEW MOBILE DEVICES.**

72.     For the tech accessory industry, in the modern era, and particularly for those in the business of designing and selling tech accessories, the launch day of a new generation of mobile devices is a key moment.

73.     Once launched, those purchasing the new generation of mobile devices also begin to purchase new cases to protect their devices, and often purchase other tech accessories as well. This is especially so where the size or features of a mobile device change – even slightly from generation to generation – meaning tech accessories for one generation often will not fit devices from another generation.

74.     Apple was expected to launch one or more new mobile devices in September 2023.

75.     Kate Spade planned its own launch of new designs of Kate Spade-branded tech accessories around the launch date of the next generation mobile devices, to coincide with the increase in new device sales.

18

76.     Kate Spade is well known in the mobile and tech accessory area and its customers rely on Kate Spade to deliver new designs to meet changing technology.  By way of example, in at least 2021 and in 2022, NPD Group, a leading market research company, ranked Kate Spade, by a wide margin, the leading brand of technology cases and mobile accessories among fashion/lifestyle brands.  And, in each of 2020, 2021, and 2022, NPD Group ranked Kate Spade as the only fashion/lifestyle brand among the top 10 brands in the technology cases and mobile accessories category overall.

77.     The design, tooling, manufacturing, and customer acquisition (for distributors and retailers) process associated with this launch requires weeks of diligent work and planning. This generally includes working with a licensing partner, such as Vinci in prior years and Case-Mate now, to develop, distribute, and sell Kate Spade-branded tech accessories.

78.     As a result of Vinci's repeated failures to comply with modified payment plans, Kate Spade grew concerned about Vinci's ability to perform the obligations of the License Agreement, including its ability to make anticipated payments and meet manufacturing, supply and distribution expectations related to the expected September 2023 launch by Apple. Subsequent to Vinci's March 23, 2023 default, Kate Spade's concerns grew, and, as a consequence, Kate Spade was being independently approached by several, interested, potential licensees and began the process of identifying another licensing partner to manufacture, distribute, and sell Kate Spade-branded tech accessories in time for the expected September 2023 launch event.

79.     During this same period, on May 11, 2023, more than a month after Vinci defaulted on the License Agreement, Kate Spade received notice of public auction of Vinci's debt by Vinci's lender, Siena.

80.     On May 26, 2023, Kate Spade sent correspondence to Siena invoking its rights to collateral in advance of the debt auction. A portion of Vinci's debt was thereafter sold to Case-Mate.

81.     In early June 2023, Kate Spade was notified that Case-Mate intended to auction off the collateral interest.

82.     Against this backdrop of Vinci's failure to meet its payment obligations, along with the public sale of its debt, concerns continued to mount as to Vinci's ability to continue to perform as Kate Spade's non-exclusive licensee.

83.     As of April 2023, Vinci's then-Chief Executive Officer Brian Stech and then-Chief Financial Officer Joe Sklenkar had departed Vinci, and it was unclear who was leading Vinci.  Mr. Stech and Mr. Sklenkar had been key contacts to the KSNY brand and business partners.

84.     Around the time the notices of the public auction were released, Kate Spade began to receive calls from entities indicating that they were interested in becoming a potential new partner with Kate Spade in connection with licensed tech accessories and mobile devices.  Among other things, these potential partners noted that Vinci seemed to be struggling financially.

85.     On June 14, 2023, Kate Spade terminated its License Agreement with Vinci. Due to Vinci's having concealed its multiple breaches,  Kate Spade did not know at the time that the License Agreement had automatically terminated prior to June 14, 2023.

86.     On June 15, 2023, KSNY sent Vinci a notice exercising Kate Spade's rights upon the termination of the License Agreement. The Notice of Licensor's Exercise of Rights instructs Vinci to cancel all cancellable orders for Licensed Merchandise as required by the License Agreement. The Notice of Licensor's Exercise of Rights also expressly confirmed Kate Spade's right to purchase Vinci's entire inventory of Licensed Merchandise (including as to any non-cancellable orders in process as of the date of termination) and put Vinci on further notice of its obligation to provide a list of its current inventory of Kate Spade Licensed Merchandise to KSNY. The Notice of Licensor's Exercise of Rights also demanded that Vinci pay all amounts due and return all works of authorship incorporating the Kate Spade Licensed Marks and Merchandise IP created under the License Agreement to Kate Spade by 5:00 PM on June 16, 2023. Vinci did not comply, and did not make the payments or return any items to Kate Spade.

87.     Furthermore, after Vinci complained, Kate Spade sought to discuss how Kate Spade and Vinci could jointly message the termination of the License Agreement with Vinci; Vinci has not expressed any interest in such a statement or mutually-approved announcement.

20

88.　　On June 14, 2023, Kate Spade and Case-Mate executed a license agreement, granting Case-Mate rights to manufacture, distribute, offer to sell, sell, etc. tech accessories, including phone cases, bearing the KATE SPADE® Marks (the "Case-Mate License Agreement").

89.　　On June 21, 2023, Vinci and Onward, at Tebele's and Haddad's direction, without notice to or prior discussion with Kate Spade, sent correspondence to at least six of Case-Mate's suppliers, manufacturing facilities and factories, and customers, including both distributors and retailers, falsely alleging it both had a valid and in-place license to produce products bearing the KATE SPADE® Marks and was the only source that could produce and deliver those items.

90.　　Tebele participated in the drafting of the false and misleading June 21, 2023 correspondence, and approved the final letter and its transmission to customers and suppliers.

91.　　In emails transmitting the letter, Vinci told customers that the letter was an official communication from Onward, and that it was drafted by Vinci's new owners from Digital Gadgets, which is one of Tebele's companies.

92.　　In this correspondence, Vinci and Onward, at Tebele's and Haddad's direction, alleged, *inter alia*:

　　　　a.　　"Vinci Brands holds a valid and in place license to produce Kate Spade products."

　　　　b.　　"[W]e have developed exciting lines for both the Kate Spade and Incipio brands via a collaborative effort. These lines have important design and quality features that have been approved by your team and conform to the highest quality and design standards."

　　　　c.　　"We would like to offer you our assurance that we are on target to deliver your full forecast on time for the launch."

　　　　d.　　"Notwithstanding anything that you have been told by this certain company, Incipio is the only company that can deliver these items. We are the only company in possession of all the necessary design drawings, tooling and

21

molds for the products you assorted, thus we are the only company that has the ability to produce these products."

e. "Any statement made by any other company claiming to be able to produce and ship these very products is false."

f. "We are looking forward to a successful launch and holiday season and build on the years of success we have had in developing these products for you year after year."

93. As a result of this correspondence, Case-Mate indicated that customers had indicated they were confused as to Kate Spade's licensee and/or expressed hesitation to place an order for Kate Spade-branded tech accessories with Case-Mate. Further, Kate Spade and Case-Mate faced time sensitivity to finalize customer orders and place factory orders for Kate Spade-branded tech accessories to meet the demand from Apple's expected September 2023 launch.

94. Vinci's, Onward's, Tebele's, and Haddad's conduct subjected both Kate Spade and Case-Mate in significant reputational, financial and other risks, and required each to expend significant additional resources, to ensure that they do not miss out on the September 2023 launch event and expected demand for new mobile devices and tech accessories.

95. Vinci's, Onward's, Tebele's, and Haddad's conduct in sending this correspondence without notifying and/or seeking to discuss with Kate Spade reveals Vinci's, Onward's, Tebele's, and Haddad's motives were to induce and exacerbate confusion over who held a valid license to use the KATE SPADE® Marks, *i.e.*, Case-Mate. Vinci's, Onward's, Tebele's, and Haddad's conduct has undermined and disrupted Case-Mate's work and required additional investment to address the confusion intentionally created by Vinci.

## F. VINCI'S CONTINUED USE OF THE KATE SPADE® MARKS AFTER TERMINATION OF THE LICENSE AGREEMENT.

96. Upon information and belief, Vinci continued to manufacture, advertise, promote, offer to sell, sell, distribute, or deal in or with Infringing Products, namely tech accessories bearing the KATE SPADE® Marks after termination of the License Agreement.

97.    A review of Vinci's website (https://incipio.com/), after termination of the License Agreement, indicates it was still advertising for sale, and, upon information and belief, selling, Infringing Products including, for instance, the items listed in the non-exhaustive listing below:

| Product | Product Name | Product URL |
|---|---|---|
| | kate spade new york Defensive Hardshell Case for Samsung Galaxy S23 Ultra | https://incipio.com/products/kate-spade-new-york-defensive-hardshell-case-for-samsung-galaxy-s23-ultra |
| | kate spade new york Protective Hardshell Case for iPhone 14 Pro | https://incipio.com/products/kate-spade-new-york-protective-hardshell-case-for-iphone-14-pro |
| | kate spade new york High Gloss Protective Hardshell Case for iPhone 14 Pro | https://incipio.com/products/kate-spade-new-york-high-gloss-protective-hardshell-case-for-iphone-14-pro |
| | kate spade new york Protective Hardshell Case for Google Pixel 7a | https://incipio.com/products/kate-spade-new-york-protective-hardshell-case-for-google-pixel-7a |

98.    On June 21, 2023, Vinci posted the following to their social media accounts, including Instagram, reconfirming their advertising and sale of Infringing Products:

23



99.    A review of Vinci's Facebook page similarly indicated they were continuing to advertise, offer for sale, and, upon information and belief, actually sell, Infringing Products after termination of the License Agreement:



100.    Further, upon information and belief, and as referenced *supra* Section F, Vinci, also on June 21, 2023, followed this misleading social media post with sending false and deliberately misleading correspondence to suppliers, manufacturing partners and factories, distributors, and retail customers of Kate Spade branded tech accessories alleging it was the proper and sole licensee

24

of the KATE SPADE® Marks for use with tech accessories, to the exclusion of the true licensee, Case-Mate.

101. After June 5, 2023, Onward, led by Haddad and Tebele, controlled Vinci's websites and marketing, and caused these acts of infringement.

102. Accordingly, upon information and belief, Vinci is, without authorization, working to manufacture and take orders for future Kate Spade-branded tech accessories and is currently selling the exact same Kate Spade-branded tech accessories, *i.e.*, Infringing Products, to the identical customers, through identical channels of trade, and in direct competition with Kate Spade's Authentic Products.

103. As a result, customers who are encountering and purchasing Kate Spade brand tech accessories are likely to and in fact are being confused about the source, origin, or sponsorship of Vinci's unlicensed products. Further, Vinci is, without authorization, actively holding itself out as the sole source of authentic Kate Spade brand tech accessories to factories and customers, significantly exacerbating the likelihood of and actual confusion.

104. On June 16, 2023, without any prior notice or further discussions with Kate Spade, Vinci filed in the United States District Court for the Southern District of New York a complaint seeking damages and injunctive relief related to Kate Spade's alleged breach of Section 3.2 of the License Agreement.

105. On June 22, 2023, again without any prior notice or further discussions with Kate Spade, Vinci filed an amended complaint adding additional breach of contract, declaratory judgment, and tortious inference claims, again seeking damages and injunctive relief.

106. By reason of Vinci's and Onward's acts, Kate Spade has and will continue to suffer damage to its business, reputation, goodwill, profits, and sales. Unless enjoined, Vinci and Onward will continue to sell its Infringing Products using the KATE SPADE® Marks without authorization, which will irreparably damage Kate Spade. Kate Spade's remedies at law are not adequate to compensate Kate Spade for all the resulting injuries caused by Vinci and Onward.

**G.** **ACS, AT TEBELE'S AND HADDAD'S DIRECTION, ASSERTS AND ACTS ON ITS PURPORTED RIGHTS TO SEIZE, POSSESS, DISPOSE OF, AND SELL THE COLLATERAL IN VIOLATION OF THE LICENSE AGREEMENT AND LANHAM ACT.**

107.    On June 27, 2023, ACS, by its counsel, attended a joint hearing in this action and in the related action brought by Vinci regarding KSNY's and Vinci's motions for preliminary injunctions and temporary restraining orders.

108.    On July 1, 2023, ACS filed a complaint in the Supreme Court of the State of New York, *ACS Group Acquisitions LLC v. Kate Spade LLC et al.*, Index No. 653181/2023, Judge Cohen (the "ACS Action"), in which ACS made a series of factual misstatements, misconstrued and ignored the License Agreement, and misapplied the law. This suit was voluntarily discontinued.

109.    In that suit, ACS erroneously contended, *inter alia*, that:

      a.    ACS is a secured creditor and first-priority lienholder of Vinci with rights under Article 9 of the Uniform Commercial Code ("UCC") to the Alleged Collateral superior to the rights of KSNY under the License Agreement (*see* PX25, ECF No. 25-4, Declaration of Charles Tebele ("Tebele Decl."), ACS Action, ¶¶ 3, 8, 27-32, 45-46, 50) – notwithstanding that ACS's purported rights to the Alleged Collateral are derived solely from (and subject in all respects to and limited to) that very License Agreement, and limited by applicable law;[6]

      b.    ACS has "undisputed rights as a secured creditor under Article 9 of the Uniform Commercial Code (the 'UCC') to take possession of the Collateral, including the Kate Spade-branded merchandise already manufactured and 'in process' and ordered, and to sell such Collateral in partial satisfaction of

---

[6]    Exhibit K to the Tebele Declaration was attached to the Amended Verified Complaint as PX 26 (ECF No. 25-5) and is incorporated by reference as if fully set forth herein.  Other exhibits are not attached hereto, are available in the ACS Action at NYSCEF Nos. 14-24.

Vinci's loan obligations to ACS," notwithstanding the limitations discussed in subparagraph (a) above (*see id.*, Tebele Decl., ¶¶ 8, 10, 45-46);

c.    KSNY's communications with its suppliers, distributors, retailers, and customers, confirming its rights in and under its KATE SPADE® Marks – including the right to control products bearing its trademarks, and accurately stating that post-termination of the License Agreement, Case-Mate, not Vinci, was the sole licensee of KSNY authorized to produce tech accessories bearing KATE SPADE® Marks trademarks – somehow violated and interfered with ACS's purported rights as a secured creditor, notwithstanding the limitations discussed in subparagraph (a) above (*see id.*, Tebele Decl., ¶¶ 10, 13, 43-44, 54-55); and

d.    ACS also erroneously contends that it has "the absolute right to seize, distribute, and sell" Kate Spade branded products in Vinci's possession or "in process" "in any manner as it sees fit," notwithstanding the limitations discussed in subparagraph (a) above (*see id.*, Complaint, ACS Action, ¶60).

110.    Based on these assertions, ACS seeks a declaration in the ACS Action that ACS has "superior priority to seize, to take possession, to dispose of and to sell the" Alleged Collateral, which "includes the Licensed Merchandise and In Process Orders." (PX27, ECF No. 25-6, Complaint, ACS Action, p. 15. (*See also* PX28, ECF No. 25-7, Amended Proposed Order to Show Cause, ACS Action, p. 2).

111.    Also based on these assertions, ACS sought injunctive relief in the ACS Action, including an order (i) enjoining and restraining KSNY from "taking any and all actions that interfere with ACS's [alleged] rights as a secured lender under the UCC" and from "communicating with Vinci's suppliers and customers … that ACS and any appointed agent do not have the right to sell and manufacture the" Alleged Collateral, and (ii) ordering KSNY "to issue a Letter of Authorization" – in the form of a letter on Kate Spade letterhead attached to ACS's affidavit – to be distributed to Vinci's suppliers and customers … stating that ACS (and

27

any appointed agent) is authorized by Defendants to manufacture, distribute, and/or the sell the" Alleged Collateral.  (PX28, ECF No. 25-7, Amended Proposed Order to Show Cause, ACS Action, p. 2).

112.    However, ACS does not have the rights it purports to have, namely, the right to seize, to take possession, to dispose of or to sell the Alleged Collateral.

113.    It is undisputed that, regardless of any security interest that ACS may have in Vinci's property, ACS has no rights whatsoever in any of KSNY's property, including KSNY's trademarks.

114.    In addition, ACS's security interest in Vinci's property (if any) is subject in all respects to and limited to Vinci's contractual and/or legal rights in such property.

115.    Vinci's default as set forth above and the termination of the License Agreement (among other things) have substantially limited and restricted Vinci's rights in the Licensed Merchandise and In Process Orders, *i.e.*, the Alleged Collateral.

116.    The License Agreement includes (without limitation) the following limitations:

a.    KSNY always retained the right to control every aspect of Vinci's usage of the Licensed Mark(s), such as (i) the selection of Vinci's permitted manufacturers, distributors, and all approved channels and customers for KATE SPADE® branded tech accessories, (*see* PX2, ECF No. 1-2, § 4); (ii) the right to require all items of Licensed Merchandise that are sold reflect the high-quality standards KSNY has established and is recognized by, (*see id.*, § 6.1); and (iii) the right to develop and control all components of an advertising and promotion program surrounding the Licensed Merchandise, including the creative components, the media used, and the advertising agency(ies) employed to promote the same, for which Vinci must pay KSNY a royalty (*see id.*, §7.2);

b.    The License Agreement expressly states that it could not be construed to confer rights on any third party, and that, among other restrictions, "[o]nly

28

the parties to this Agreement will have any rights under or be entitled to enforce this Agreement" (*id.*, §21.9);

c.    At least as early as February 10, 2023, given Vinci's default on obligations in excess of $1 million, Vinci no longer has "the right to sell or otherwise transfer Licensed Merchandise or otherwise use the Licensed Mark(s)" (PX2, ECF No. 1-2, §§3.3, 3.6.);

d.    Post-termination, all of Vinci's rights under the License Agreement terminated and reverted automatically to KSNY, and neither Vinci "nor any of its receivers, representatives, trustees, agents, successors or assigns (by operation of law or otherwise) will have any right to manufacture, exploit, advertise, merchandise, promote, sell, distribute or deal in or with Licensed Merchandise, and Licensee and all of its assignees, successors or assigns (by operation of law or otherwise) will forthwith discontinue all use of the Licensed Mark(s) and any derivation, component, variation or simulation thereof, or any mark confusingly similar therewith, and all references thereto or hereto …." (*see id.*, §12.1(a)); and,

e.    Post-termination, Vinci is obligated to make disclosures to KSNY so that KSNY may determine whether and the extent to which to exercise its Inventory Purchase Option, and Vinci has no right to dispose of or sell any KATE SPADE® branded tech accessories (if any) unless and until KSNY declines to acquire Vinci's entire inventory pursuant to KSNY's Inventory Purchase Option, (*see id.*, §§12.1-12.4); KSNY has the right to purchase Vinci's inventory "for an aggregate purchase price equal to the lower of Licensee's cost of such Licensed Merchandise and/or Promotion Products or market value for same." (*Id.*, §12.2.)

117.    In addition, trademark licenses (such as contained in the License Agreement) are personal and are not assignable absent express consent from the licensor, as a matter of federal law.

118.    Accordingly, ACS does not possess a license for the Alleged Collateral and, because (among other reasons) Vinci has no right to dispose of or sell any of the Alleged Collateral, ACS similarly has no right to seize, take possession of, dispose of, or sell any of the Alleged Collateral.

119.    Therefore, by its threats and its actions, including the filing of the ACS Action and its motion therein, ACS is, without authorization and in open contravention of the terms of the License Agreement – which provides the sole basis upon which all rights to the Alleged Collateral are derived, and to which all rights are subject and limited – threatening to seize, take possession of, dispose of, and sell the exact same Kate Spade-branded tech accessories, *i.e.*, Infringing Products, in direct competition with Kate Spade's Authentic Products, all in violation of the Lanham Act.

120.    ACS has taken concrete and substantial steps to use KATE SPADE® Marks in connection with the sale or other disposal of the Alleged Collateral.

121.    For example, in the ACS Action, ACS asserted in an affidavit and its complaint (among other papers) that it has the right to seize, take possession of, dispose of, and sell certain Kate Spade branded products. In that public filing, ACS also submitted, as an exhibit to its affidavit, a letter on Kate Spade letterhead, which accurately stated that Case-Mate was Kate Spade's only authorized licensee; ACS asserted that that Kate Spade letter should be modified to state erroneously "that ACS (and any appointed agent) is authorized by [KSNY] to manufacture, distribute, and/or sell the" Alleged Collateral, i.e., Kate Spade branded products.  (*See* PX28, ECF No. 25-7, Amended Order to Show Cause, ACS Action, p.3; PX26, ECF No. 25-5, Tebele Aff., Exh. K.)

122.    As a result, customers who would encounter and purchase Kate Spade brand tech accessories from ACS are likely to be confused about the source, origin, or sponsorship of these unauthorized and unlicensed products.

123.    The relief ACS sought in the ACS Action in New York state court, included an order directing KSNY to state erroneously "that ACS (and any appointed agent) is authorized by [KSNY] to manufacture, distribute, and/or sell the" Alleged Collateral, i.e., Kate Spade branded products, are also facilitating ACS's infringement. (*Id.*)

124.    The relief ACS sought in the ACS Action in New York state court, included the request for a temporary restraining order to facilitate its seizure, taking possession of, disposal of, and selling of Infringing Products, for example, further demonstrates that ACS's infringement is imminent and impending.

125.    By reason of ACS's actions and threats, Kate Spade has and will continue to suffer damage to its business, reputation, goodwill, profits, and sales. Unless permanently enjoined, ACS will seize, take possession of, dispose of, and sell Infringing Products using the KATE SPADE® Marks without authorization, which will irreparably damage Kate Spade. Kate Spade's remedies at law are not adequate to compensate Kate Spade for all the resulting injuries caused by ACS.

126.    Both Tebele and Haddad, as ACS's owners and managers, personally took part in and directed ACS's unauthorized use of the KATE SPADE® Marks. As ACS has no employees, Tebele and Haddad made all decisions and took all actions for ACS, including ACS's decision to seize, market, and offer for sale Kate Spade Goods without Kate Spade's consent or authorization.

127.    At Tebele's and Haddad's direction, ACS seized Kate Spade Goods without Kate Spade's consent on numerous occasions, including on July 27, 2023, September 2, 2023, September 13, 2023, October 2, 2023, October 19, 2023, October 31, 2023, November 13, 2023, 16, 2023, November 21, 2023, November 22, 2023, and November 29, 2023. Tebele personally approved ACS's seizure of Kate Spade Goods on behalf of ACS and also on behalf of Vinci (through a power of attorney).

31

128.    At Tebele's and Haddad's direction, ACS marketed and offered for sale Coach Goods without Coach's consent. For example, on January 19, 2024, Tebele, on behalf of ACS, sent a letter to Ross Stores, which stated that Vinci had surrendered Coach Goods to ACS to effect the sale of the goods to Ross Stores.

## H.    ONWARD, AT TEBELE'S AND HADDAD'S DIRECTION, USED KATE SPADE® MARKS WITHOUT KATE SPADE'S AUTHORIZATION.

129.    Section 2.3(a) of the License Agreement provides that the License Agreement is "strictly personal to Licensee," and may not be "transferred, assigned … or otherwise hypothecated or disposed of, either directly or indirectly, in whole or in part, by operation of law or otherwise … without the prior written approval of Licensor."

130.    On June 5, 2023, through the Services Agreement, Vinci assigned, transferred, and otherwise hypothecated or disposed of its rights under the License Agreement to Onward in breach of Section 2.3(a) of the License Agreement.

131.    Tebele, Haddad, and Onward specifically concocted the Services Agreement to circumvent the License Agreement's express prohibition on unapproved assignments and transfers. In an unavailing attempt to evade Section 2.3(a) of the License Agreement, the Services Agreement states that Onward is merely Vinci's "agent" and an "intermediary" in transactions involving Kate Spade Goods, Vinci "maintains all rights and obligations as a licensee," and Onward is not being given "the status of a licensee."

132.    But the reality and effect of Services Agreement is clear: Vinci remained the licensee in name only, and Onward took over all or nearly all aspects of Vinci's performance under the License Agreement, including sales, sourcing, logistics, warehousing, distribution, customer invoicing, customer collection, back office services, and accounting. By August 1, 2023, Vinci no longer had any employees to fulfill its obligations under the License Agreement, and all obligations were performed by Onward.

133.    Kate Spade did not consent to the Services Agreement or the assignment and transfer of Vinci's rights under the License Agreement to Onward. In fact, in communications and

court filings, Vinci feigned its continued performance as Kate Spade's claimed licensee. Vinci did not disclose the Services Agreement to Kate Spade until May 2024, more than 11 months after the agreement was executed and long after Vinci, ACS, and Tebele participated in an evidentiary hearing before this Court.

134.    Tebele and Haddad contrived and executed the Services Agreement because Kate Spade did not consent to Tebele and Haddad's takeover of Vinci and the License Agreement. Before June 5, 2023, Kate Spade had discussions with Tebele about a potential transaction between Tebele and Vinci, but did not approve such a transaction.

135.    After June 5, 2023, Onward ordered and oversaw the manufacturing, transportation, and supply of Kate Spade Goods without Kate Spade's consent.

136.    After June 5, 2023, Onward marketed, offered for sale, and sold Kate Spade Goods without Kate Spade's consent. Onward's actions caused confusion in the marketplace about whether Onward held a license to use KATE SPADE® Marks. It did not.

137.    Onward received and kept revenue from the unlicensed and unapproved sales of Kate Spade Goods.

138.    Both Tebele and Haddad, as the owners and managers of Onward, personally took part in and directed Onward's unauthorized use of the KATE SPADE® Marks, unauthorized manufacturing, transportation, and supply of Kate Spade Goods, unauthorized marketing and sale of Kate Spade Goods, and false and communications to customers about the KATE SPADE® Marks.

139.    Tebele testified during his deposition that both he and Haddad, as Onward's owners, managed and were actively involved with Onward's actions to procure and sell Kate Spade Goods.

140.    Between June 2023 and January 2024, Haddad personally directed Onward employees and consultants to have Kate Spade Goods manufactured, including by Onward's supplier Salmon, and to sell and deliver Kate Spade Goods to customers, including to Atlantia, Best Buy Canada, Viastara, and Ross Stores—all without Kate Spade's consent.

33

141.    Throughout 2023 and into 2024, at Tebele's and Haddad's direction, Onward acted as if it Kate Spade had authorized Vinci to assign the License Agreement to Onward and granted it the right to manufacture and sell Kate Spade Goods, when, in fact, Onward had no such rights.

142.    Onward's actions, made at Tebele and Haddad's direction, resulted in Kate Spade losing the ability to control its KATE SPADE® Marks because Onward oversaw the manufacturing, transportation, storage, marketing, and distribution of Kate Spade Goods without Kate Spade's consent, involvement, authorization, or knowledge.

143.    Onward did not report or pay Kate Spade royalties for its sales of Kate Spade Goods.

144.    Onward's actions, made at Tebele's and Haddad's direction, harmed Kate Spade by causing Kate Spade to sell less Kate Spade Goods through its authorized channels and by causing confusion among ordinary consumers as to the source, sponsorship, affiliation, and approval of Kate Spade Goods sold by Onward and Vinci.

### First Cause of Action

(Federal Trademark Infringement under 15. U.S.C. § 1114 – Against Vinci)

145.    KSNY realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

146.    The KATE SPADE® Marks are valid protectable trademarks.

147.    The KATE SPADE® Marks are distinctive and famous. A significant number of the consuming public associate the KATE SPADE® Marks with a single source, Kate Spade.

148.    Vinci has used and continues to use the KATE SPADE® Marks without Kate Spade's license, consent or authorization.

149.    Vinci has used and continues to use the KATE SPADE® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, in a manner that is likely to cause and has actually caused confusion with Kate Spade's use of the KATE SPADE® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Kate Spade and Vinci's goods.

34

150.    Vinci's use of the KATE SPADE® Marks is a reproduction, counterfeit, copy, or colorable imitation of Kate Spade's use of the KATE SPADE® Marks.

151.    Vinci's unlicensed, un-consented to, and otherwise unauthorized use of the KATE SPADE® Marks is likely to cause and is actually causing confusion, mistake, or deception.

152.    Vinci has knowingly and willfully used and continue to knowingly and willfully use the KATE SPADE® Marks to cause confusion, to cause mistake, or to deceive consumers.

153.    By virtue of Vinci's acts hereinabove described, Vinci committed and continues to commit acts of trademark infringement in violation of, *inter alia,* Section 32(1)(a), 15 U.S.C. § 1114(1)(a).

154.    Vinci's aforesaid acts of trademark infringement caused and will continue to cause damage and irreparable harm to KSNY, and are likely to continue unabated, thereby causing further damage and irreparable harm to KSNY and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

155.    KSNY has no adequate remedy at law and will suffer irreparable injury if Vinci is allowed to continue to wrongfully use Kate Spade's KATE SPADE® Marks.

156.    Because of Vinci's infringement of Kate Spade's KATE SPADE® Marks, including Vinci's willful and intentional conduct, KSNY is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

### Second Cause of Action

(Federal Unfair Competition and False Advertising under 15 U.S.C. § 1125(a) – Against Vinci)

157.    KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

158.    Vinci's unlicensed, un-consented to, and otherwise unauthorized copying and use of the KATE SPADE® Marks in connection with its advertising, marketing, promotion, offer, sale, and/or provision of its Infringing Products constitutes a false and misleading designation of origin and a false and misleading representation of facts, which:

35

a.  is likely to and is in fact causing confusion, mistake, or deceiving consumers and the public as to the affiliation, connection, or association of Vinci with Kate Spade, or as to the origin, sponsorship, or approval of Vinci's goods or commercial activities by Kate Spade; and

b.  in commercial advertising or promotion, misrepresent the nature, characteristics, or qualities of Kate Spade's goods, services, or commercial activities.

159.  By virtue of Vinci's acts hereinabove described, Vinci committed and continues to commit acts of unfair competition and false advertising in violation of, *inter alia,* Section 43(a), 15 U.S.C. § 1125(a).

160.  Vinci's aforesaid acts of unfair competition and false advertising caused and will continue to cause damage and irreparable harm to KSNY, and are likely to continue unabated, thereby causing further damage and irreparable harm to Kate Spade and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

161.  KSNY has no adequate remedy at law and will suffer irreparable injury if Vinci is allowed to continue to wrongfully use Kate Spade's KATE SPADE® Marks.

162.  Because of Vinci's unfair competition and false advertising, including Vinci's willful and intentional conduct, KSNY is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

### Third Cause of Action

(New York Trademark Infringement, N.Y. Gen. Bus. Law § 360 – Against Vinci)

163.  KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

164.  The KATE SPADE® Marks are valid protectable trademarks under New York law.

165.  The KATE SPADE® Marks are distinctive and famous. A significant number of the consuming public associate the KATE SPADE® Marks with a single source, Kate Spade.

166.    Vinci has used and continues to use the KATE SPADE® Marks without Kate Spade's license, consent or authorization.

167.    Vinci has used and continues to use the KATE SPADE® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, in a manner that is likely to cause and has actually caused confusion with Kate Spade's use of the KATE SPADE® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Kate Spade and Vinci's goods.

168.    Vinci's use of the KATE SPADE® Marks is a reproduction, counterfeit, copy, or colorable imitation of Kate Spades' use of the KATE SPADE® Marks.

169.    Vinci's unlicensed, un-consented to, and otherwise unauthorized use of the KATE SPADE® Marks is likely to cause and is actually causing confusion, mistake, or deception.

170.    Vinci has knowingly and willfully used and continues to knowingly and willfully use the KATE SPADE® Marks to cause confusion, to cause mistake, or to deceive consumers.

171.    By virtue of Vinci's acts hereinabove described, Vinci committed and continues to commit acts of trademark infringement in violation of N.Y. Gen. Bus. Law § 360.

172.    Vinci's aforesaid acts of trademark infringement caused and will continue to cause damage and irreparable harm to KSNY, and are likely to continue unabated, thereby causing further damage and irreparable harm to Kate Spade and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

173.    KSNY has no adequate remedy at law and will suffer irreparable injury if Vinci is allowed to continue to wrongfully use Kate Spade's KATE SPADE® Marks.

**Fourth Cause of Action**

(New York Deceptive Trade Practices, N.Y. Gen. Bus. Law § 349(a) – Against Vinci)

174.    KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

37

175.    Vinci's acts, including the unlawful, unauthorized use and imitation of the KATE SPADE® Marks in connection with the sale, offering for sale, distribution, and advertising of competing Infringing Products, causes a likelihood of confusion or of misunderstanding among ordinary consumers as to the source, sponsorship, approval, certification, affiliation, connection, or association of Kate Spade's and Vinci's respective goods.

176.    By virtue of Vinci's acts hereinabove described, Vinci committed and continues to commit deceptive trade practices in violation of N.Y. Gen. Bus. Law § 349(a).

177.    The aforesaid deceptive trade practices caused and will continue to cause damage and irreparable harm to Kate Spade and are likely to continue unabated, causing further damage and irreparable harm to Kate Spade and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

178.    KSNY has no adequate remedy at law and will suffer irreparable injury if Vinci is allowed to continue to engage in these deceptive trade practices.

### Fifth Cause of Action

(New York Trademark Dilution, N.Y. Gen. Bus. Law § 360-L – Against Vinci)

179.    KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

180.    The KATE SPADE® Marks are valid, protectable trademarks that are distinctive and have acquired further secondary meaning through widespread sales and marketing. A significant number of the consuming public associate the KATE SPADE® Marks with a single source, Kate Spade. Thus, the KATE SPADE® Marks are extremely strong marks.

181.    Vinci's use of the KATE SPADE® Marks is likely to impair the distinctiveness of the KATE SPADE® Marks because the ordinary consumer is likely to perceive Vinci's Infringing Products bearing the KATE SPADE® Marks as substantially similar to Kate Spade's Authorized Products cases bearing the identical KATE SPADE® Marks.

182.    Accordingly, Vinci has violated New York General Business Law § 360-L, which states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

183. Because of Vinci's dilution of Kate Spade's KATE SPADE® Marks, including Vinci's willful and intentional conduct, KSNY is entitled to injunctive relief under New York General Business Law § 360-L.

### Sixth Cause of Action

#### (Common Law Unfair Competition – Against Vinci)

184. KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

185. Vinci's unlawful and unauthorized use and imitation of the KATE SPADE® Marks in connection with the sale, offering for sale, distribution, and advertising of competing, infringing tech accessories (*i.e.*, the Infringing Products), constitutes infringement, passing off, copying, imitation, and misappropriation of Kate Spade's intellectual property, unjust enrichment of Vinci, and unfair competition with Kate Spade in violation of Kate Spade's rights under the common law of the State of New York and other states of the United States.

186. Vinci's willful acts of misrepresentation, fraud, and deception have unjustly enriched Vinci by exploiting Kate Spade's reputation in the market, caused harm to KSNY, and violated KSNY's rights.

### Seventh Cause of Action

#### (Breach of Contract: Sections 2.3(a), 3.3(b), 3.3(d), 3.3(e), 3.3(f), 3.5, 3.6(a), 7.2, 7.8, 8.1, 8.2, 11.8, and 11.10 of the License Agreement – Against Vinci)

187. KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

188. The License Agreement, including all amendments thereto, was a valid and enforceable contract at all relevant times hereto, and bound Vinci to its terms and conditions.

189.    Vinci has failed to perform their material obligations under Sections 7.2, 7.8, 8.1, and 8.2 of the License Agreement regarding payment of Required Fees by failing to make the payments on time, repeatedly failing to abide my modified payments plans, and finally failing to cure when given the opportunity to do so pursuant to Section 3.3(a) of the License Agreement.

190.    On February 10, 2023, Siena notified Vinci that Vinci was in default on a loan ("Siena Loan") with an outstanding amount of more than $1 million.

191.    Siena, approximately three months later, on May 11, 2023, noticed a sale of the "collateral" under the Siena Loan.

192.    The Siena Loan was secured (only with KSNY's written consent and expressly subject to KSNY's rights under a consent agreement in 2021) by "Licensed Merchandise" (as defined in the License).

193.    Upon information and belief, Vinci's default to Siena on the Siena Loan was neither cured nor waived.

194.    Under Section 3.3(d) of the License, Vinci's default on any obligation in excess of $1 million "secured by a security interest in any Licensed Merchandise" constitutes an event of default.

195.    Under Section 3.5 of the License, in such event of default, the License "will terminate automatically."

196.    Section 3.6(a) of the License further provides, in such event of default, that Licensee "no longer shall have the right to sell or otherwise transfer Licensed Merchandise or otherwise use the Licensed Mark(s)" absent both Licensee providing notice of the default and Licensor waiving its right of automatic termination.

197.    In accordance with the plain terms of the License, Vinci's default on the Siena Loan held by Siena resulted in the automatic termination of Vinci's license at least as early as February 10, 2023.

198. And, in addition to the notice requirement of Section 3.6(a), Section 11.10 of the License (*inter alia*) required Vinci to notify KSNY in writing of any notice of default on any debt secured by any of Vinci's assets.

199. The License establishes strict controls over the use of the KATE SPADE® Marks and requires that Vinci, for example: (i) be and remain creditworthy; (ii) have the financial wherewithal to protect the licensed marks, and (iii) must not, voluntarily or involuntarily, attempt to transfer rights in those marks without KSNY's express permission. *See*, *e.g.*, Section 11.8.

200. Vinci failed to provide KSNY with notice of Vinci's default on the Siena Loan held by Siena.

201. No alleged force majeure event prevented Vinci from timely performing its obligation to provide Kate Spade notice of the default on the Siena Loan held by Siena.

202. Vinci materially breached the License by defaulting to Siena on the Siena Loan and by failing to provide notice of that default to KSNY.

203. Following Vinci's default on the Siena Loan when it was held by Siena, the Siena Loan was acquired by Case-Mate in May 2023.

204. Vinci was in default on the Siena Loan, on information and belief, for an outstanding amount of more than $1 million, when the Siena Loan was acquired by Case-Mate.

205. Vinci's default on the Siena Loan continued for the period when the Siena Loan was held by Case-Mate.

206. Case-Mate, on May 24, 2023, noticed a sale of the "collateral" under the Siena Loan.

207. Upon information and belief, Vinci's default to Case-Mate on the Siena Loan was neither cured nor waived.

208. In accordance with the plain terms of the License, Vinci's default on the Siena Loan held by Case-Mate resulted in the automatic termination of Vinci's license (to the extent that it was somehow not earlier terminated as a result of Vinci's default on the Siena Loan held by Siena and/or Vinci's failure to provide notice of that default).

41

209.   Vinci failed to provide KSNY with notice of Vinci's default on the Siena Loan held by Case-Mate.

210.   No alleged force majeure event prevented Vinci from timely performing its obligation to provide Kate Spade notice of the default on the Siena Loan held by Case-Mate.

211.   Vinci materially breached the License by defaulting to Case-Mate on the Siena Loan and by failing to provide notice of that default to KSNY.

212.   Vinci breached Section 2.3(a) of the License Agreement by assigning, transferring, and otherwise hypothecating or disposing of, in whole or in part, the License Agreement, through Vinci's MDA with Superior and Vinci's Services Agreement with Onward.

213.   The License Agreement automatically terminated prior to 2023 under Sections 3.3(b) and 3.5 because Vinci was unable to pay its debts generally as they became due in 2022 and throughout 2023.

214.   The License Agreement automatically terminated on or around March 3, 2023 or, alternatively, on or around June 5, 2023, under Sections 3.3(b) and 3.5 because Vinci took corporate actions in furtherance of ceasing doing business as a going concern on or around those dates.

215.   The License Agreement automatically terminated on or around March 3, 2023 or, alternatively, on or around June 5, 2023, under Sections 3.3(e) and 3.5 because Vinci discontinued a substantial portion of its business operations on or around those dates.

216.   The License Agreement automatically terminated on or around June 5, 2023 under Sections 3.3(f) and 3.5 because Vinci sold substantially all of its assets and/or had a change of control, as the aggregate result of a series of transactions, on or around that date.

217.   As a result of the Vinci's aforementioned breaches, KSNY has sustained, and will continue to sustain, damages in an amount to be determined at trial, but not less than $4,040,000.00.

42

**Eighth Cause of Action**

(Tortious Interference with the Case-Mate License Agreement – Against Vinci)

218. KSNY realleges and incorporates herein the allegations contained in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

219. The License Agreement, including all amendments thereto, was a valid and enforceable contract at all relevant times hereto, and bound Vinci to its terms and conditions.

220. Vinci, at all reasonable times hereto, had notice and knowledge of the license agreement between Kate Spade and Case-Mate, *i.e.*, the Case-Mate License Agreement.

221. Vinci, without any justification, corresponded with KSNY and Case-Mate's suppliers, factory manufacturers, and/or customers, falsely, improperly, and without authorization, alleging it was the sole supplier of authorized Kate Spade branded tech accessories, effectively preventing Case-Mate from exercising its rights to produce, advertise, and sell their actually authorized, licensed Kate Spade tech accessories.

222. Vinci, without any justification, have attempted to induce Case-Mate's suppliers, factories, and/or customers to forego contracting with Case-Mate for the production, distribution, and sale of the authentic, licensed Kate Spade branded tech accessories in favor of Vinci's unauthorized, unlicensed, counterfeit and infringing tech accessories.

223. As a result, numerous of Case-Mate's suppliers, factory manufacturers, and customers have not and/or are not placing purchase orders with Case-Mate, inducing the breach of the Case-Mate License Agreement and the royalty provisions therein.

224. As a result of Vinci's tortious interference, KSNY has suffered and will continue to suffer significant damages and irreparable harm.

**Ninth Cause of Action**

(Federal Trademark Infringement under 15. U.S.C. § 1114 – Against ACS, Tebele, and Haddad)

225. KSNY realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

226. The KATE SPADE® Marks are valid protectable trademarks.

43

227.    The KATE SPADE® Marks are distinctive and famous. A majority of the consuming public associate the KATE SPADE® Marks with a single source, Kate Spade.

228.    ACS asserts that is has an "absolute" right to seize, take possession of, dispose of, and sell certain tech accessories bearing the KATE SPADE® Marks without Kate Spade's license, consent or authorization.

229.    ACS has exercised its purported "absolute" right, including by seizing Kate Spade Goods and offering Kate Spade Goods for sale.

230.    ACS has threatened to use and has used KATE SPADE® Marks without Kate Spade's license, consent or authorization.

231.    ACS has threatened to use and has used the KATE SPADE® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, in a manner that is likely to cause confusion with Kate Spade's use of the KATE SPADE® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Kate Spade and ACS's goods.

232.    ACS's threatened and actual use of the KATE SPADE® Marks constitutes a reproduction, counterfeit, copy, or colorable imitation of Kate Spade's use of the KATE SPADE® Marks.

233.    ACS's unlicensed, un-consented to, and otherwise unauthorized threatened and actual use of the KATE SPADE® Marks is imminent and impending, and likely to cause confusion, mistake, or deception.

234.    ACS has knowingly and willfully threatened to use and/or actually used the KATE SPADE® Marks to cause confusion, to cause mistake, or to deceive consumers.

235.    Tebele and Haddad, as ACS's owners and managers, were personally involved with and directed all of ACS's acts of trademark infringement. Tebele and Haddad were the moving, active, conscious forces behind ACS's decision to seize Kate Spade Goods and offer Kate Spade Goods for sale without Kate Spade's consent.

44

236.   Based on ACS's aforesaid acts, made at the direction of Tebele and Haddad, ACS has publicly declared its intent to use KATE SPADE® Marks and has used KATE SPADE® Marks in commerce in an infringing manner.

237.   By virtue of ACS's imminent, impending, and/or actual use of the KATE SPADE® Marks, at the direction of Tebele and Haddad, in commerce, confirmed by its repeated threats of infringement, bringing the ACS Action and seeking declaratory and injunctive relief therein, and other acts hereinabove described, ACS, Tebele, and Haddad committed and continue to commit acts of trademark infringement in violation of, *inter alia,* Section 32(1)(a), 15 U.S.C. § 1114(1)(a).

238.   ACS's, Tebele's, and Haddad's aforesaid acts of trademark infringement caused and will continue to cause damage and irreparable harm to Kate Spade, and are likely to continue unabated, thereby causing further damage and irreparable harm to KSNY and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

239.   KSNY has no adequate remedy at law and will suffer irreparable injury if ACS, Tebele, and Haddad are allowed to wrongfully use Kate Spade's KATE SPADE® Marks.  Because of ACS's, Tebele's, and Haddad's infringement of Kate Spade's KATE SPADE® Marks, including ACS's threatened and/or actual willful and intentional conduct, KSNY is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

### Tenth Cause of Action

(Federal Unfair Competition and False Advertising under 15 U.S.C. § 1125(a) – Against ACS, Tebele, and Haddad)

240.   KSNY realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

241.   ACS's unlicensed, un-consented to, and otherwise unauthorized imminent and impending and/or actual copying and use of the KATE SPADE® Marks in connection with its threatened seizure, possession, distribution, disposal, offer for sale, sale and/or provision of the

Alleged Collateral constitutes a false and misleading designation of origin and a false and misleading representation of facts, which:

    a.    is likely to and/or is in fact causing confusion, mistake, or deceiving consumers and the public as to the affiliation, connection, or association of ACS with Kate Spade, or as to the origin, sponsorship, or approval of ACS's goods or commercial activities by Kate Spade; and

    b.    in any actual or planned commercial advertising or promotion, would and does misrepresent the nature, characteristics, or qualities of Kate Spade's goods, services, or commercial activities.

242. ACS has knowingly and willfully threatened to copy and use and/or actually copied and used the KATE SPADE® Marks to cause confusion, to cause mistake, or to deceive consumers.

243. Tebele and Haddad, as ACS's owners and managers, were personally involved with and directed all of ACS's acts of unfair competition and false advertising. Tebele and Haddad were the moving, active, conscious forces behind ACS's unfair competition and false advertising.

244. Based on ACS's aforesaid acts made at Tebele and Haddad's direction, ACS has publicly declared its intent to copy and use KATE SPADE® Marks and, upon information and belief, ACS is either already using KATE SPADE® Marks in commerce or such infringing use is imminent and impending.

245. By virtue of ACS's imminent, impending, and/or actual copying and use of the KATE SPADE® Marks, made at Tebele and Haddad's direction, in commerce, confirmed by the acts hereinabove described, ACS committed and continues to commit acts of unfair competition and false advertising in violation of, *inter alia,* Section 43(a), 15 U.S.C. § 1125(a).

246. ACS's, Tebele's, and Haddad's aforesaid acts of unfair competition and false advertising caused and will continue to cause damage and irreparable harm to Kate Spade, and are likely to continue unabated, thereby causing further damage and irreparable harm to Kate Spade and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

247.    KSNY has no adequate remedy at law and will suffer irreparable injury if ACS, Tebele, and Haddad are allowed to continue to wrongfully use Kate Spade's KATE SPADE® Marks.

248.    Because of ACS's, Tebele's, and Haddad's unfair competition and false advertising, including ACS's, Tebele's, and Haddad's willful and intentional conduct, KSNY is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

### Eleventh Cause of Action

(Declaratory Judgment – Against ACS)

249.    KSNY realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

250.    ACS contends that, and in the ACS Action seeks a declaratory judgment that, in relevant part, "it has a superior priority interest to, *inter alia*, take possession, dispose of and sell the" Alleged Collateral, which "includes the Licensed Merchandise and In Process Orders," defined, respectively, as "merchandise manufactured by Vinci that bear the 'Kate Spade' brand" and "merchandise 'in process,' *i.e.* product which has been ordered but not yet manufactured and the order book" pursuant to the License Agreement.  (PX27, ECF No. 25-6, Complaint, ACS Action, ¶¶2, 73.)

251.    ACS also contends that it has "the absolute right to seize, distribute, and sell" Kate Spade branded products in Vinci's possession or "in process" "in any manner as it sees fit" without regard to the fact that these actions are prohibited by the License Agreement and applicable law, particularly given Kate Spade's famous and incontestable trademark rights.  (*Id.*, ¶60).

252.    ACS's contentions are wrong.  As set forth above, any interests that ACS may have in the Alleged Collateral, Licensed Merchandise, In Process Orders, or any other Kate Spade branded products are not "absolute" and ACS cannot simply seize, take possession of, dispose of, and/or sell the same "in any manner as it sees fit."

253.    As an initial matter, trademark licenses are personal to the licensee and are not assignable by the licensee absent express consent from the licensor, as a matter of federal law. Therefore, regardless of whatever security interest ACS has in Vinci's property, ACS has no rights in any of KSNY's property, including Kate Spade's trademarks.

254.    Further, any security interest that ACS has in the Alleged Collateral is subject in all respects to and limited to Vinci's rights in the Alleged Collateral as determined under the License Agreement and applicable law.

255.    Because Vinci defaulted as set forth above and the License Agreement was terminated (among other reasons), Vinci's rights in the Licensed Merchandise and In Process Orders, *i.e.*, the Alleged Collateral, have been substantially restricted and limited by operation of numerous provisions contained in the License Agreement (examples of which are set forth above).

256.    Because (among other reasons) Vinci currently has no right to dispose of or sell any of the Alleged Collateral, ACS similarly has no such right.

257.    Accordingly, ACS does not have any license in any of the Alleged Collateral and has no right to seize, take possession of, dispose of, or sell any of the Alleged Collateral.

258.    ACS's commencement of the ACS Action in New York state court to seek an erroneous declaration of its alleged interest, as well as ACS's motion to enjoin KSNY from (among other things) lawfully communicating "that ACS and any appointed agent do not have the right to sell and manufacture the" Alleged Collateral and ordering ACS "to issue a Letter of Authorization … to be distributed to Vinci's suppliers and customers … stating that ACS (and any appointed agent) is authorized by Defendants to manufacture, distribute, and/or the sell" Licensed Merchandise and In Process Orders comprising Kate Spade branded products, (*see* PX28, ECF No. 25-7, Proposed Order To Show Cause, p. 2), constitute a justiciable controversy between the KSNY and ACS.

259.    KSNY thus seeks a declaration that (i) ACS's security interest (if any) in the Alleged Collateral is subject in all respects to and limited to Vinci's rights in the Alleged Collateral as determined under the License Agreement and applicable law; (ii) consequently, as of March 31,

48

2023 (if not earlier), ACS does not have any license in the Alleged Collateral or any right to seize, take possession of, dispose of, or sell any of the Alleged Collateral or any other Kate Spade branded products, and (iii) therefore, ACS is unauthorized to copy or use, in any way, any of Kate Spade's KATE SPADE® Marks.

260.    KSNY seeks a further declaration that ACS's use, impending use, imminent use, and publicly documented intended use of Kate Spade's KATE SPADE® Marks, including in connection with ACS's efforts to enforce its alleged rights in the Alleged Collateral, constitute intentional and willful trademark infringement, false designation of origin, unfair competition, false advertising, misappropriation and trademark dilution in violation of federal and New York law.

261.    By reason of the foregoing, KSNY is entitled to injunctive relief against ACS, restraining ACS from (i) seizing, taking possession of, disposing of or selling, any Kate Spade branded products; (ii) engaging in any other acts of trademark infringement against KSNY; and (iii) directly or indirectly continuing to litigate the ACS Action, by which ACS seeks to legitimize and perpetuate its infringement of the KATE SPADE® Marks, until ACS's lack of rights under the Lanham Act to use the KATE SPADE® Marks has been determined by this Court.

## Twelfth Cause of Action

**(Federal Trademark Infringement under 15 U.S.C. § 1114 – Against Onward, Tebele, and Haddad)**

262.    KSNY realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

263.    The KATE SPADE® Marks are valid protectable trademarks.

264.    The KATE SPADE® Marks are distinctive and famous. A significant number of the consuming public associate the KATE SPADE® Marks with a single source, Kate Spade.

265.    Onward has used the KATE SPADE® Marks without Kate Spade's license, consent or authorization.

49

266. Onward has used and continues to use the KATE SPADE® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, in a manner that is likely to cause and has actually caused confusion with Kate Spade's use of the KATE SPADE® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Kate Spade and Vinci's goods.

267. Onward's use of the KATE SPADE® Marks is a reproduction, counterfeit, copy, or colorable imitation of Kate Spade's use of the KATE SPADE® Marks.

268. Onward's unlicensed, un-consented to, and otherwise unauthorized use of the KATE SPADE® Marks is likely to cause and is actually causing confusion, mistake, or deception.

269. Onward, Tebele, and Haddad have knowingly and willfully used and continue to knowingly and willfully use the KATE SPADE® Marks to cause confusion, to cause mistake, or to deceive consumers.

270. Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of trademark infringement. Tebele and Haddad were the moving, active, conscious forces behind the Services Agreement and Onward's unauthorized and unapproved actions to sell, offer for sale, distribute, and advertise Kate Spade Goods.

271. By virtue of Onward's, Tebele's, and Haddad's acts described above, Onward committed and continues to commit acts of trademark infringement in violation of, *inter alia,* Section 32(1)(a), 15 U.S.C. § 1114(1)(a).

272. Onward's acts of trademark infringement, made at Tebele's and Haddad's direction, caused and will continue to cause damage and irreparable harm to KSNY, and are likely to continue unabated, thereby causing further damage and irreparable harm to KSNY and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

273. KSNY has no adequate remedy at law and will suffer irreparable injury if Onward, Tebele, and Haddad are allowed to continue to wrongfully use KATE SPADE® Marks.

274. Because of Onward's Tebele's and Haddad's infringement of Kate Spade's KATE SPADE® Marks, including Onward's, Tebele's, and Haddad's willful and intentional conduct, KSNY is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

**Thirteenth Cause of Action**

(Federal Unfair Competition and False Advertising under 15 U.S.C. § 1125(a) – Against Onward, Tebele, and Haddad)

275. KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

276. Onward's unlicensed, un-consented to, and otherwise unauthorized copying and use of the KATE SPADE® Marks in connection with its advertising, marketing, promotion, offer, sale, and/or provision of its Infringing Products constitutes a false and misleading designation of origin and a false and misleading representation of facts, which:

    a.    is likely to and is in fact causing confusion, mistake, or deceiving consumers and the public as to the affiliation, connection, or association of Vinci with Kate Spade, or as to the origin, sponsorship, or approval of Vinci's goods or commercial activities by Kate Spade; and

    b.    in commercial advertising or promotion, misrepresent the nature, characteristics, or qualities of Kate Spade's goods, services, or commercial activities.

277. By virtue of Onward's acts described above, Onward committed and continues to commit acts of unfair competition and false advertising in violation of, *inter alia,* Section 43(a), 15 U.S.C. § 1125(a).

278. Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of unfair competition and false advertising. Tebele and Haddad were the moving, active, conscious forces behind the Services Agreement and Onward's

51

actions unfair competition and false advertising, including the sending of the false June 21, 2023 letter described in Paragraphs 88-91 above.

279.    Onward's, Tebele's, and Haddad's acts of unfair competition and false advertising caused and will continue to cause damage and irreparable harm to KSNY, and are likely to continue unabated, thereby causing further damage and irreparable harm to Kate Spade and to the valuable goodwill symbolized by and associated with its distinctive KATE SPADE® Marks, unless enjoined and restrained by the Court.

280.    KSNY has no adequate remedy at law and will suffer irreparable injury if Onward, Tebele, and Haddad are allowed to continue to wrongfully use Kate Spade's KATE SPADE® Marks.

281.    Because of Onward's, Tebele's, and Haddad's unfair competition and false advertising, including Onward's, Tebele's, and Haddad's willful and intentional conduct, KSNY is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

## Fourteenth Cause of Action

(New York Trademark Dilution, N.Y. Gen. Bus. Law § 360-L – Against Onward, Tebele, and Haddad)

282.    KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

283.    The KATE SPADE® Marks are valid, protectable trademarks that are distinctive and have acquired further secondary meaning through widespread sales and marketing. A significant number of the consuming public associate the KATE SPADE® Marks with a single source, Kate Spade. Thus, the KATE SPADE® Marks are extremely strong marks.

284.    Onward's, Tebele's, and Haddad's use of the KATE SPADE® Marks is likely to impair the distinctiveness of the KATE SPADE® Marks because the ordinary consumer is likely to perceive Vinci's Infringing Products bearing the KATE SPADE® Marks as substantially similar to Kate Spade's Authorized Products cases bearing the identical KATE SPADE® Marks.

52

285.    Accordingly, Onward, Tebele, and Haddad have violated New York General Business Law § 360-L, which states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

286.    Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of trademark dilution. Tebele and Haddad were the moving, active, conscious forces behind the Services Agreement and Onward's unauthorized and unapproved actions to sell, offer for sale, distribute, and advertise Kate Spade Goods.

287.    Because of Onward's, Tebele's, and Haddad's dilution of Kate Spade's KATE SPADE® Marks, including Onward's, Tebele's, and Haddad's willful and intentional conduct, KSNY is entitled to injunctive relief under New York General Business Law § 360-L.

**Fifteenth Cause of Action**

(Common Law Unfair Competition – Against Onward, Tebele, and Haddad)

288.    KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Third Amended Complaint as if fully set forth herein.

289.    Onward's, Tebele's, and Haddad's unlawful and unauthorized use and imitation of the KATE SPADE® Marks in connection with the sale, offering for sale, distribution, and advertising of competing, infringing tech accessories (*i.e.*, the Infringing Products), constitutes infringement, passing off, copying, imitation, and misappropriation of Kate Spade's intellectual property, unjust enrichment of Onward, Tebele, and Haddad, and unfair competition with Kate Spade in violation of Kate Spade's rights under the common law of the State of New York and other states of the United States.

290.    Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of unfair competition. Tebele and Haddad were the moving,

active, conscious forces behind the Services Agreement and Onward's unauthorized and unapproved actions to sell, offer for sale, distribute, and advertise Kate Spade Goods.

291.    Onward's, Tebele's, and Haddad's willful acts of misrepresentation, fraud, and deception have unjustly enriched Onward, Tebele, and Haddad by exploiting Kate Spade's reputation in the market, caused harm to KSNY, and violated KSNY's rights.

**Sixteenth Cause of Action**

(Tortious Interference with Contract – Against Onward)

292.    KSNY realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

293.    The License Agreement, including all amendments thereto, is a valid and enforceable contract.

294.    Section 2.3(a) of the License Agreement states that it is strictly personal to Licensee and cannot "be transferred, assigned, pledged, sold, mortgaged, sublicensed, or otherwise hypothecated , either directly or indirectly, in whole or in part, by operation of law otherwise (collectively 'transfer') to any Person without the prior written approval of Licensor."

295.    Prior to June 5, 2023, Onward had knowledge of the License Agreement, including the fact that License Agreement could not be assigned or transferred without Kate Spade's prior written approval. Haddad was provided a copy of the License Agreement when conducting diligence on Vinci in the lead up to the June 5, 2023 transactions.

296.    Onward entered the Services Agreement, which had the effect of assigning, transferring, and otherwise hypothecating or disposing of the Licensee Agreement, in whole or in part, from Vinci to Onward.

297.    Onward intentionally caused Vinci to breach Section 2.3(a) of the License Agreement by causing it to assign, transfer, or otherwise hypothecate or dispose of the License Agreement, in whole or in part, without Kate Spade's approval. Onward's principals, Tebele and Haddad, designed the June 5, 2023 transactions with the intent of attempting to circumvent the License Agreement's express prohibition of unapproved assignments and transfers.

54

298.     Onward's tortious interference with the License Agreement was without justification. Onward, Tebele, and Haddad had no legitimate reason for the Services Agreement, and solely executed it in an unlawful attempt to circumvent the License Agreement's express prohibition on unapproved assignments and transfers.

299.     As a result of Onward's tortious interference with the License Agreement, Kate Spade has suffered damages in an amount to be proven at trial.

## Jury Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Kate Spade, LLC and Coach Services, Inc. request a jury trial of all issues that may be tried to a jury in this action.

## Prayer for Relief

Plaintiffs Kate Spade, LLC and Coach Services, Inc. thus pray for an Order and Judgment:

a.     Entering a temporary, preliminary, and permanent injunction enjoining Vinci, ACS, Onward, Tebele, and Haddad, as well as their officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, and those in privity with Vinci, ACS, Onward, Tebele, and/or Haddad and those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, from manufacturing, marketing, distributing, or selling phone cases or other tech accessories using the KATE SPADE® Marks, or any other products that use, imitate, or copy any of the KATE SPADE® Marks;

b.     Entering a temporary, preliminary, and permanent injunction enjoining Vinci, ACS, Onward, Tebele, and Haddad, as well as their officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, and those in privity with Vinci, ACS, Onward, Tebele, and/or Haddad and those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, from directly or indirectly tortiously interfering with the Case-Mate License Agreement;

55

c.    Entering a temporary, preliminary, and permanent injunction enjoining Vinci ACS, Onward, Tebele, and Haddad, as well as their officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, and those in privity with Vinci, ACS, Onward, Tebele, and/or Haddad and those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, from directly or indirectly corresponding with Case-Mate's suppliers, factory manufacturers, distributors, and/or customers that Vinci or ACS is authorized to produce, manufacture, advertise, distribute, offer for sale, or sell Infringing Products or any other product bearing the KATE SPADE® Marks;

d.    Entering a temporary and preliminary injunction enjoining ACS, as well as their officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, and those in privity with ACS, and those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, from directly or indirectly continuing to litigate the ACS Action, until ACS's lack of rights under the Lanham Act to use the KATE SPADE® trademarks has been determined by this Court;

e.    Declaring that (i) ACS's security interest (if any) in the Alleged Collateral is subject in all respects to and limited to Vinci's rights in the Alleged Collateral as determined under the License Agreement and applicable law; (ii) consequently, as of March 31, 2023 (if not earlier), ACS does not have any license in the Alleged Collateral or any right to seize, take possession of, dispose of, or sell any of the Alleged Collateral or any other Kate Spade branded products, and (iii) therefore, ACS is unauthorized to copy or use, in any way, any of Kate Spade's KATE SPADE® Marks;

f.    Declaring that ACS's use, impending use, imminent use, and publicly documented intended use of Kate Spade's KATE SPADE® Marks, including in connection with ACS's efforts to enforce its alleged rights in the Alleged Collateral, constitute intentional and

56

willful trademark infringement, false designation of origin, unfair competition, false advertising, misappropriation and trademark dilution in violation of federal and New York law;

g.      Directing Vinci and ACS to file with this Court and serve on Kate Spade's counsel of record within 30 calendar days after service of an injunction, reports under oath setting forth in detail the manner and form in which Vinci and ACS have complied with the injunction;

h.      Directing that (i) all point-of-sale materials, labels, signs, boxes, prints, catalogues, line sheets, marketing materials, internet web pages, metatags, packages, papers, other trade dress, and advertisements in the possession or control of Vinci, ACS, Onward, Tebele, and Haddad comprising or bearing images, illustrations, or representations of the Infringing Products, the KATE SPADE® Marks, or the Kate Spade name be delivered to Kate Spade's counsel in accordance with written instructions from Kate Spade; (ii) Vinci, ACS, Onward, Tebele, and Haddad disclose the identities of the vendors, manufacturers, distributors, suppliers, retailers, and e-commerce partners (if any) of the Infringing Products, which, for avoidance of doubt includes, without limitation, the Alleged Collateral; and (iii) all Infringing Products be delivered to Kate Spade in accordance with written instructions from Kate Spade;

i.      Ordering payment of all amounts due under the License Agreement;

j.      Ordering an accounting of Vinci's, ACS's, Onward's, Tebele's, and Haddad's profits (if any) arising from Vinci's unfair competition and trademark infringement;

k.      Ordering an award of Vinci's, ACS's, Onward's Tebele's, and Haddad's profits (if any) to Kate Spade, including disclosure of the number of Infringing Products sold in the United States and an accounting of the gross revenue derived from sale of the Infringing Products;

l.      Ordering an award of damages to Kate Spade;

m.      Ordering an award of treble the actual damages awarded for use of a counterfeit mark pursuant to 15 U.S.C. § 1117(b). Kate Spade reserves the right to elect, any time before final judgment, statutory damages under 15 U.S.C. § 1117(c) in lieu of actual damages and profits;

57

58

n.       In the alternative to actual damages and profits, ordering an award of statutory damages in an amount of not more than $2,000,000 per counterfeit mark per type of services and/or goods sold or offered for sale by Vinci, ACS, Onward, Tebele, and Haddad;

o.       Ordering pre-judgment and post-judgment interest on the above damage awards;

p.       Ordering an award of costs and reasonable attorneys' fees and expenses incurred by Kate Spade in connection with this action; and,

q.       Ordering such other and further relief that this Court may deem just.

Dated:  New York, New York
       October 10, 2024

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:    */s/  Timothy R. Beyer*
        Christine Cesare
        Bret Ruber
        Jane Ernst
        1290 Avenue of the Americas
        New York, NY 10104
        T: (212) 541-2000
        E: cbcesare@bclplaw.com
        E: bret.ruber@bclplaw.com
        E: jane.ernst@bclplaw.com

        Timothy Beyer (*pro hac vice*)
        Adam Stern
        1700 Lincoln Street, Suite 4100
        Denver, CO 80203-4541
        T: (303) 866-0481
        E: tim.beyer@bclplaw.com
        E: adam.stern@bclplaw.com

        Nicholas Bedo (*pro hac vice*)
        One Atlantic Center, 14th Floor
        1201 W. Peachtree Street, N.W.,
        Ste. 1400
        Atlanta, GA 30309
        T: (404) 572-6670
        E: nick.bedo@bclplaw.com

        *Attorneys for Coach Services, Inc.*
        *and Kate Spade LLC*